Good morning, Your Honors. Good morning. If it pleases the Court, my name is Kim Gauthier, and I, along with my colleagues at Council Table, represent the Commissioner of the California Department of Corporations in this matter. As a housekeeping matter, I would like to point out to the Court, as it already is aware, I'm sure, that there are two important issues raised in this appeal, both of which involve issues of consumer protection. The issue that I will address, which involves core issues of federalism as well as consumer protection, is whether the Office of the Comptroller of the Currency, or the Comptroller, has exclusive regulatory authority over non-bank, state-chartered corporations that also happen to be operating subsidiaries of national banks. The remaining issue, which is whether or not the California's per diem interest statute is preempted by the Depository Institutions Deregulation Monetary Control Act, or for our purposes, the Monetary Control Act, excuse me, will be addressed by my colleague, Mr. Doug Gooding. I've allotted 20 minutes for oral argument with regard to the Comptroller issue, 5 minutes for Mr. Gooding, and I'd like to reserve 5 minutes for a rebuttal. There was a third issue, too. Is that going to be pressed about the, whether there's the injunction, the 1983 issue? Yes, that is raised. And whether that should be dismissed, or is someone arguing that? Yes, I will address that in rebuttal if it is raised by cross-appellees, or cross-appellants, excuse me, in their primary argument. State regulation of operating subsidiaries does not threaten the national bank system. The Commissioner recognizes that pursuant to the National Bank Act, the Comptroller has regulatory authority over national banks. However, the very issues in this case focus on the Comptroller's claimed authority over non-bank, state-chartered corporations. There has been no legal authority from the Comptroller, Wells Fargo, or National City indicating that the Comptroller had congressional authorization to regulate such entities. Specifically, we're talking about regulations promulgated by the Comptroller, 12 CFR 5.34, as well as 12 CFR 7.4006. Your basic argument is that I simply have no authority to operate, to regulate anything but the federally chartered national bank itself? To the exclusion of the states, Your Honor. We're not contending. Well, that's different. But I thought you were challenging the authority. Yes, I'm saying there's no delegation of authority, Your Honor, from Congress to the Comptroller to regulate non-bank, state-chartered corporations. All right. So you're saying that the answer to Judge Bergeson's question is not just to the exclusion of the state, but that they can't do it at all? Actually, no, Your Honor. I don't think that my position goes that far. I think under nation's banks, the Comptroller of the currency, in interpreting the incidental powers of the national banks pursuant to 24-7, that they can engage in these activities through operating subsidiaries if it is convenient or useful to the banks, is, for purposes of argument, a permissible construction of that statute. However, to the extent that that regulation goes on to state that these entities, these non-bank, state-chartered corporations are — These are state-chartered in the sense that they are state-incorporated? Is that what you mean by that? That is correct, Your Honor. And the national banks have no state incorporation or simply — you're going to have to deal with a little bit of lack of knowledge about the national bank system, but I think it's better that we understand it. Okay. National banks are national affiliations. They get their charter directly from the Comptroller or from the federal government. So there are no state corporations involved at all? That is correct. No state corporations. Is there a difference between state license and state charter, or is that the same thing? Because one of the issues here is whether you can withdraw their license. Does that mean withdrawing their charter? It depends in what case you're talking about. I think in the case of banks, we're typically talking about federally chartered or state chartered. No, no, I'm talking here about the wholly-owned operating subsidiary, which you like to call the state-chartered non-bank. Corporation, yes. Yes. Now, that entity, when you say it's state-chartered, is that the same as the state license that you're now trying to revoke? In this case, yes, it is. I thought it wasn't. I thought that they were state-incorporated, first of all, just a regular state incorporation. State corporation. State, like any other corporation. And second of all, that they needed a license to do the mortgage bank, the mortgage function. I think there's some confusion perhaps between myself and the Court, so I'd like to clarify. State-chartered, as it is stated in this situation, would mean corporate, corporate entity. It doesn't necessarily receive its corporate identity from California. It could receive it from another state. And that's not what you were trying to revoke. No, I wasn't. Right. That's what Judge Breinhart was asking. Okay. I'm sorry. I misunderstood, Judge. With regard to the license, I think it's important also to note that with regard to these two entities, Wells Fargo Home Mortgage, Inc., as well as National City Mortgage Company, they voluntarily sought licensure from the commissioner. And only after they asserted that they would not comply with the statutory scheme under which they had obtained that license did we seek to revoke the license. Now, national banks, under your own regulations, don't require the licensure. That is correct. They are exempt from the statutory scheme. That's because it's your understanding, I presume it's because, that you can't, that that is preempted and you can't do that. That's correct, Your Honor. There's no contention that any of the commissioner's statutes under his jurisdiction would apply to the national banks. So getting back to my point, and I think the Court, we need to make it clear that the analysis that has to be applied here is obviously conflict preemption analysis. I don't think that there's any disagreement between any of the parties that that is the proper analysis. But prior to getting to the point of conflict preemption, we need to analyze the regulations at issue. And again, I go back to my point that a delegation of authority from Congress to the comptroller to regulate in this area. In a way, I keep getting stranded at my original point. You, if it is, there is authority, and you say you're willing to accept for now that there is authority, to regulate as incidental to the banking business, the subsidiaries that engage in business, the business of banking, to some degree, on what logic would you say that the federal regulation is non-exclusive as to the subsidiaries, but exclusive as to the national bank? The national bank is a federally created entity, whereas the operating subsidiary is a state-created entity. The fact that the national bank may find it useful or convenient to conduct this business, in this instance mortgage lending, through an operating subsidiary, does not convert that operating subsidiary to a federal entity or to a federally chartered national bank. It exists separate and apart from the national bank. It's a separate legal entity. So why can't the OCC regulate it at all, then? I'm having trouble understanding this middle ground position, which may be an attractive one as a practical matter, but as a logical matter, I'm not understanding it. Well, because the comptroller has interpreted the 24-7, the incidental powers provision, to provide that national banks can engage in banking activity through operating subsidiaries, and it can have an effect, that business, on the national bank, I don't wish to stand here today and say that the comptroller cannot go in and exercise any jurisdiction over those. It might help me understand this a little. Maybe it's a question that's really for your opponents, but maybe you can tell me. Do your opponents agree with you that these wholly owned operating subsidiaries require state charters? I don't think that they would disagree with me that in every instance they are a state chartered corporation. But would they have to be a state chartered corporation? Could they not just operate pursuant to the authority of the comptroller? If they were to do that, it's a way that I've not looked at it, quite honestly, Your Honor, before. Well, there are other reasons why. Another overall problem, though, is that we don't really understand, or I don't understand why they chose to do this through these state corporations, whether there are tax reasons or non-banking reasons for doing that. But traditionally, if you were to operate as an artificial entity in this country, you have to be chartered by somebody. Correct. Or else you're just a partnership or an aggregation of people, and there are all kinds of consequences. So presumably they need either a national bank charter or they need a state charter just to make them an entity. Yes, but to answer Judge Reinhold's question, no, I don't suppose that they do have to hold a state charter or be a state corporation. However, as Judge Berzon points out, you would either be a partnership or even an independently owned company and subjecting yourself to personal liability. Well, why more than a bank? I mean, if they could operate pursuant to the authorization of the comptroller the way a bank can, I mean, why are they any more exposed than the bank is exposed? They are exposed less, actually, Your Honor, because they have separate assets and liabilities than the national bank. Therefore, if something were to happen with the state chartered operating subsidiary, you would not be able to reach the national bank. But let me just, to just pierce a minute, it seems that your argument about who can regulate what turns at least in large part on where the charter for the entity's existence is coming from. But California actually, as I understand it, one of these entities which has now disappeared was a California corporation, but the other one wasn't, right? That's correct. It does not matter to my argument, Your Honor, whether or not they're state chartered in California or whether they're chartered corporations from another state. My point is, is that they are not national banks. They don't have the same requirements in order to meet the qualifications to become a federally chartered national bank. They don't have the same obligations. Well, is that plain? I mean, the regulations seem to suggest that maybe they do. I mean, this is very peculiar. I thought they could only do what a bank does. And if they are subject to all the rules that banks are subject to. That's correct. That's the interpretation that the comptroller has placed on this provision with regard to operating subsidiaries. So I don't know why the comptroller doesn't just authorize them the same way he does the bank. But he doesn't. He does it merely by either a letter notifying the comptroller that the national bank is going to conduct activities through an operating subsidiary or through an application procedure. But, again, they are not national banks. They're not federally chartered. He still has to give his approval, though, right? In some instances, for new business that's going to be conducted or for a new operating subsidiary through which the bank has never operated before, he would have to give his approval. However, in other instances, it can be an after-the-fact notification by letter from the bank to the comptroller. And that's it? That's it. Without any approval? Yes. To get back to my point, Your Honors, Chevron analysis instructs us that, as I said before, we need to look whether or not there's a delegation of authority. And it's our position that there is no delegation of authority to the comptroller to regulate in the area of non-bank operating subsidiaries. That's not what you said. That's why I keep collapsing. You said there is some authorization. What I said was it could be a permissible interpretation of the statute for the comptroller to say that they can conduct banking business through operating subsidiaries. That does not, in turn, mean that there was a delegation from Congress to operate or to regulate in this area. To regulate the subsidiaries. To regulate the subsidiaries, to the exclusion of the states. Well, or at all. Or at all. Just because it's convenient or useful to the national bank does not then mean that the comptroller has jurisdiction to the exclusion of the states over those entities. It's hard, sort of drawing back from it, to understand why you would authorize the comptroller to regulate the banks and authorize the comptroller to say banks can operate through certain subsidiaries, but the comptroller would not be authorized to regulate the subsidiaries. I'm not saying that the comptroller isn't authorized to regulate the subsidiaries. I'm saying that the comptroller is not authorized to regulate the subsidiaries to the exclusion of the states. Where they are conducting their business. Where they are engaged in activities that affect the consumers. Well, why? If you can do that with the banks, why can't you do it with the subsidiaries? Because it's not a national bank. Well, I know that. But it's not a national bank. It's a subsidiary of a national bank. And it's a separate legal entity from the national bank. All right. Okay. Applying a Chevron. It's a two-part test, as this Court is aware. And the first question is whether Congress has directly spoken to the precise question at issue. And as with the delegation of authority, we would contend that the Congress has not spoken to the precise question at issue. Nowhere in the National Bank Act does Congress ever mention operating subsidiaries. Nowhere in the Graham-Leach-Bliley Act does Congress define or mention operating subsidiaries, except to exclude operating subsidiaries from the definition of a financial subsidiary. Even if you were to find that Congress has left a gap that the comptroller was interpretation of the National Bank Act is not a permissible construction of the statutory scheme, again, nowhere does the National Bank Act or any other federal regulatory scheme speak to operating subsidiaries. However, even if you were to find that the comptroller properly promulgated the regulations, they are not inconsistent with state law, and it does not frustrate the purposes for which national banks were organized for them to subject themselves to operating subsidiaries. For example, as stated before, Wells Fargo Home Mortgage, as well as National City Mortgage, voluntarily obtained licenses from the California Corporations Commissioner. They operated under these licenses, respectively, with regard to Wells Fargo Home Mortgage three years and National City Mortgage five years, prior to ever asserting that they were operating subsidiaries of the national bank and were not subject to the commissioner's jurisdiction. It was only after the commissioner conducted an audit of both of these companies to which they voluntarily complied that we asked them to perform a further audit and do refunds to California consumers for violation of the California per diem interest statute that they contended that they were not subject to our jurisdiction. The comptroller enforced that requirement? The comptroller contends that, yes, he could enforce that requirement. However, it is important to note that both in briefs filed with this Court as well as the lower court, that the comptroller has stated that they will enforce state laws to the extent that they make a determination that they are not preempted. And in this case, the comptroller has come forward to assert its position that the Monetary Control Act does preempt California's per diem statute. Now, if we were to say, for instance, that it's not preempted, then he would be required to enforce it. There is no statutory authority for the comptroller to step in and enforce that state law. I'm saying that it's the comptroller's position as well as a lower district court opinion that says that the comptroller has that authority. Has the comptroller ñ well, I guess I need to ask him this. I don't understand whether it's his position that the ñ that your substantive statute with regard to the charging of interest is itself preempted. I understand he's saying it's preempted by the Monetary Control Act, but I don't understand whether he's saying it's preempted or whether it's an issue in this case, whether it's preempted by the National Bank Act. There's been no position by the comptroller that, in fact, our substantive statute with regard to per diem interest is preempted by the National Bank Act. It is the comptroller's position that it's preempted by the Monetary Control Act. I note that I'm getting close to my time, and I'd like to turn the microphone over to my colleague, Doug Gooding, unless the Court has any other questions for me. Thank you. Thank you. Good morning, Your Honors. My name is Doug Gooding. I also represent the Commissioner in this case. This is a case ñ or this ñ in this instance, the plaintiff appellees allege preemption of the State per diem statutes by the Monetary Control Act. It is important to note that the only cases that have ever interpreted the Monetary Control Act language expressly limiting the rate or amount of interest have all taken into account the legislative history and purpose of the Monetary Control Act. And let me take a brief moment to read a very important portion of the legislative history that this act was created, firstly, in the late 70s and 1980, in a time of very, very high interest rates. And the crisis that was facing the mortgage industry is that state usury laws were, in some cases, forbidding the charging of interest at levels which were, in fact, the cost of money to the lenders. And the history is as follows. Where state usury laws require mortgage rates below market levels of interest, mortgage funds in those states will not be readily available, and those funds will flow to other states where market yields are readily available. This artificial disruption of funds availability not only is harmful to potential homebuyers in states with such usury laws, it also frustrates national housing policies and programs. The committee analyzing this bill believed this should be a limited modification in state usury laws. And it focused on state usury ceilings as the problem it was addressing in preempting any laws which expressly limited the rate or amount of interest. The ---- But in this instance, the amount of interest that could be charged on certain days is zero, right? Well, Your Honor, that's, I think, a rather clever conceit that's attempted by the other side in this case, because it ---- what the per diem interest statutes of California really try to do is effect a consumer protection resolution of a problem in the real world of a mortgage transaction, which is the lender is going to fund at a particular time in the process. The interest to the consumer is that that moment of funding occur as closely as possible to the end of everything, so he is not or she is not paying interest on a loan for which the ---- But the date of recordation is kind of a strange choice of the end of everything. It is a choice, Your Honor, that ---- Which has been changed now. It has been changed. It was originally chosen in a bill, an amendment to the bill, which in fact was sponsored by the California Mortgage Bankers Association precisely because it is a bright line. It is a bright line. And in the actual world of escrow and mortgage transactions, it was a line to which they had been performing and have been able to perform, by and large. They now challenge the entire structure of the per diem statutes on the basis of Federal preemption. But the per diem statutes do not in any manner affect the supply of money. Your Honor, as you interpret this, the state law, could a mortgage document be written to provide that if we don't record, you know, right away, then the overall interest on the whole loan goes up by point, point, point, point, 1 percent a month, i.e.,  Is there any way of making up the difference so that the same amount of money is ultimately collected? People could contract for whatever they want, I suppose, Your Honor. They may want to follow several regulations and so forth and have to be very careful. But I'm trying to find out why this isn't a rate or amount. And one reason why it might not be a rate or amount is if it was possible to collect the same amount of money regardless of your statute. That's essentially what was said in the First Circuit case, right? I think the point is that the rate or amount language in the Monetary Control Act is intended by the framers of that act, by the authors of that act, to address an issue of state usury ceilings having a choking effect on the supply of money. And clearly, the per diem statutes in California have no reasonable basis to respect that. The question is, if there were a statute like that, for some unimaginable reason, you know, we had some kind of home failures the way we have in the United States,    interest effected by that statute. The way I had the farms in 1930. Our economic policy came crashing down, and you wanted to say, the state wanted to say, no interest payments can be collected for a year. In other words, that would be a timing question, not a rate or amount question. That seems to me the way you're analyzing this case. Why not?  Well, I don't think it would have an effect on the supply of money in the state that is passing that statute, because banks would tend not to want to make loans in that state. That's because this is a short amount of time? I'm just having trouble understanding what line of demarcation you're arguing for between this statute and one that is a rate or amount statute. I understand. I believe I can address the issue this way. The very short amount of time during which this statute will have any effect, really all it does is determine when you can begin charging interest, as opposed to say you can only charge zero for a certain amount of time. I think that's rather specious. But it says you can only begin charging interest one day. It's not specious. It's exactly correct. I mean, that's just a different way of saying the same thing. But given its function in the process of a mortgage transaction, it says you can only begin charging interest on that day, and it's a very short time. In the context of the purpose of the Monetary Control Act, which is to prevent usually ceilings from having a choking effect on the supply of money, it is nonexistent. It does not do that. And therefore, when you are taking the ---- The answer to my hypothetical has to be that it's also that you would say the same thing about it. I'm sorry? That the answer to my hypothetical has to be that the same thing is true. I mean, I don't see how you can have a logical answer that turns on how long the time period is. My point, I think, Your Honor, is that if the purpose of the Monetary Control Act is to ---- when it used the terms expressly limiting the rate or amount of interest were to deal with State usury ceilings, then a situation or a statute addressed to a time period this short within the escrow process is not one that it intended to preempt. And I believe that my time is up, and I'm encroaching on Ms. Kochi's rebuttal time. All right. Thank you, Your Honor. We'll give her the five minutes for rebuttal. If it pleases the Court, my name is Horace Sneed, and I represent the Comptroller of the Currency. The decision of Judge Burrell that ---- in which he found that the State may not exercise visitorial powers over operating subsidiaries of national banks, and in which he concluded that the Monetary Control Act preempts application of the California per diem statute is a proper interpretation of the relevant statutes and appropriate application of the constitutional principles. There are two things that would be helpful to me to know just for background reasons. Is your position, which is based on visitorial powers, are you distinguishing between what you can enforce and which substantive rules apply? In other words, would it be your position specifically, for example, that the State statute about the timing of interest absent the preemption with the Monetary Control Act might be a valid regulation, but only you could enforce it? Is that your argument? That is our argument, that the Comptroller of the Currency enforces all statutes with respect to national banks and their operating subsidiaries. And that would be your position if it was the national bank as well? I mean, do you ---- It would be our position as to the national bank as well that ---- The national bank can be subject to State regulation of mortgages, but only you can enforce it. There may be State laws, and this is what the Third Circuit said in the Long case, which was a redlining case. They said that the State law applies to the national bank, but it's only the Comptroller of the Currency that can enforce that State law against the national bank. And that's because Congress has provided in Section 484 that a national bank shall not be subject to any visitorial power except as authorized under Federal law. So the substantive preemption would be narrower and would come from where? The ---- I'm sorry. The substantive preemption would be narrower than the visitorial preemption. And where does it come from? Is it just ordinary conflict preemption, or does it come from something expressed in the statute? The ---- It's conflict preemption that we're dealing with here. No, but I'm asking, any substantive preemption is ---- is there a field preemption with some scope that is substantive with regard to national banks, or is it all ---- but substantively, is it all conflict preemption? Substantively, if I'm understanding your question correctly. If the question is, does this law apply to the national bank, that's conflict preemption typically. There may be some very narrow fields where we would say there is some nature of field preemption, but in general, the preemption, the style of preemption that we're dealing with is conflict preemption. So if you have a regulation that's in conflict with the state regulation, then they can't do it, but otherwise the states can't substantively, but only you can enforce it. That is correct. Do you do that? Do you enforce state laws? Yes, we do. We enforce state laws against national banks and bank operating subsidiaries, and we do it under the Federal ---- under Federal law. I'm sorry. I don't understand that. Well, we have ---- our enforcement authority is ---- comes under 12 U.S.C. 1818 and 12 U.S.C. 93, and we also have some enforcement authority under 12 U.S.C. 506. Under 1818, the types of enforcement actions that we can take for violations of any law include not injunctions, but we can do civil money penalties, we can do cease and desist orders, we can take action against individuals and actually force them out of banking. Could you order to make refunds? Yes, we can order restitution. And, in fact, the Comptroller of the Currency has used its authority to order hundreds of millions of dollars of refunds of restitution to consumers since 2000. Based on state law? Based on Federal law, state law. Many of these are enforcement actions taken under the Federal Trade Commission Act, which prohibits unfair and deceptive practices, so that we do have authority and we exercise that authority to ensure that national banks comply with the law, and we can take action if national banks are not complying with state laws. Now, another background question. You said in your brief that ---- I understood your brief to be saying that the license itself was preemptive, the license requirement. That is correct. Now, why is that? That's not for the same reason. That presumably is because of a conflict reason. That is conflict preemption. But your statutes ---- but your rigs don't say there has to be a ---- you don't, in fact, license the subsidiaries. You license some of the subsidiaries. You have applications for some of the subsidiaries, and others they can do simply by notice. The notice is the licensing decision that we have by regulation said with respect to these activities and these circumstances, as a matter of convenience, we will authorize the license to conduct an activity in the operating subsidiary. And we have done that by regulation in 5.34. Most operating subsidiaries are created by application to the controller. It is a process that includes the opportunity to comment on the application by the public and a decision by an appropriate official at the controller's office designating ---- setting forth our decision and the basis for our decision. So there is an extensive licensing process. But with respect to certain common types of activities conducted ---- But just this one. This is an activity that is listed as one that national banks may engage in if they have ---- Then they just have to give notice. They give notice after the fact, yes. But the license is a key element here because it is through the license that the State asserts the authority to regulate, take enforcement action against, and exercise any visitorial power over the activities of the operating subsidiary. This is not ---- The operating subsidiary has already been licensed, or the national bank has been licensed to conduct these activities in the operating subsidiary. And to save it, that permission now has to stand in abeyance pending the decision of the State whether the national bank will be able to engage in this activity. The operating subsidiary is a conflict with the authority of the national bank to conduct the activity. The operating subsidiary is simply a tool. It's a means by which the national bank conducts permissible activities. They use the operating subsidiary to do no more than they would do as a bank. The use of an operating subsidiary neither enhances nor does it detract. Sotomayor, operating facilities need State charters? Operating subsidiaries are typically, I think exclusively, State chartered institutions. Whether they have to be State chartered institutions is not clear. The Comptroller does have authority to charter banks and could charter banks to conduct these activities. And there must be, and I don't know if you know what it is, and I don't know if it matters for a decision, but there's some real world reason this is all happening, which is really a bit of a mystery on this record. I suspect it's evolutionary. Operating subsidiaries initially were a means for national banks to compartmentalize activities and conduct them. Over time, they would engage in an activity by acquiring an existing corporation. In fact, in this case, one of the reasons the operating subsidiaries have licenses from the State is that they were originally owned by the holding company. They were not bank subsidiaries. They became bank subsidiaries and did not give up their licenses. They kept their licenses for reasons of convenience, just whatever reasons, but they were not required to have the licenses once they became operating subsidiaries because the authorization to conduct the activity flowed through the national bank and it was the national bank conducting the activity. So viewed in that fashion, what the Commissioner is trying to do here is impose a licensing requirement that says the bank can't engage in this activity, although it's authorized and the Commissioner concedes that it's authorized, the bank is authorized to engage in this activity through an operating subsidiary, but only if the State will permit it. And not only that, that the State can then exercise authority to direct the activities of the operating subsidiary, potentially in a way that conflicts with what the OCC might require. The potential conflict is the license revocation to prevent them from engaging in that? That's one of the conflicts. What if they just went in and did an audit and then reported the results of the audit to the OCC and said, hey, take some action? The visitorial authority includes the authority to come in and conduct an audit because an audit itself has an effect on the operations of the institution. It requires the institution to direct resources to an area that the visitor, in this case the person conducting the audit, wants the institution to direct its activity, direct its attention. And that is something that can occur. Just to the audit? Just to the audit. Just so far as that audit. In this case, it was directing the institution to review two years of mortgage applications at a time when mortgage refinancing was at its height, and to have them focus on this particular aspect of that operation to the exclusion, rather than what the controller might have wanted the bank to be turning its attention to. It is that potential problem that makes this dual licensing and dual visitorial. But this dual system, I mean, the other thing that's sort of mysterious is that all of a sudden there are, I guess in three different places, significant lawsuits about this, but they don't seem to have ever been before with regard to the preemption of this kind of state regulation. Why is that? Is this just new? I know you have new regulation, which is more specific as to the preemption, but I presume that your position hasn't varied, has it? Our position has not varied that we alone exercise visitorial powers over the activities of national banks. I think that states have become more aggressive in pursuing activities against ‑‑ But the relative positions of the parties has not changed substantively. I would say that it has sharpened. When you say it hasn't changed, I think that we have always, I think on both sides, tried to accommodate each other, that we are not ‑‑ that our interest is not to pick a fight with the states, and when we have issues that come up, we try to resolve them. I think more recently the issues have come up more frequently and that we needed clarification. And I should make a point that there are areas that, even for national banks, not in relation to their banking authorities, not in relation to their banking activities, but with respect to other activities where the state does have a role to play. But with respect to the bank's banking activities, whether conducted directly or by an operating subsidiary, the Comptroller alone has authority to exercise visitorial power. Before your time runs out, would you just, as I recall from reading your brief, at the very end you took the position that the Monetary Control Act preempted California's per diem statutes. It wasn't really, there wasn't a lot of analysis there, or deep analysis, should we say. It was a very short piece of our brief. The Monetary Control Act says that the states cannot reduce the amount of interest, cannot limit the amount of interest that are charged on first mortgages. This statute, by its very terms, requires that the bank accept lower interest than it contracted for. It reduces the interest. It sets a limit on the interest that the bank may collect. You had asked earlier, does this in fact reduce the interest on the loan, the interest that the bank can collect? Yes, it does. Would you take the same position, and I know you may not be able to, but with regard to the new California statute which basically says that you can only charge interest once the loan has been funded? I mean, that seems like something else. That is, I can't answer that because I don't know how that operates in practice. Even if the situation here were that you could, there was some assurance that, you never had a case where the loan is funded today and it takes a week before the mortgage gets recorded, we would not be here because of the violations. I don't think we would find that that would be a type of interference or a violation of DIDMCA. What wouldn't be? The requirement that you can't charge until the funding? Well, if in fact there is an identity of the time that the loan is made and the time you can start interest, then there is no conflict with DIDMCA. The bank can get what it has contracted for. And if it were a matter that the bank, the reason I can't answer the question about the new statute is because I don't know how it works in practice. In practice, if this statute, the current, the prior per diem statute, had no effect, in other words, there was no gap between when the funds are advanced and when the mortgage is actually recorded, I don't think we would have a DIDMCA violation. That's what I'm trying to say. Is that? I just wanted you to clarify your position, that's all. Thank you. Thank you. Thank you. May it please the Court, I am Robert Long, representing Wells Fargo Bank, National City Bank of Indiana, and National City Mortgage Company. I'm fourth up at the end of the day, and we have three issues, the regulation of the National Bank operating subsidiary, the preemption of the California per diem statute, and the retaliation issue. I will, of course, be guided by the issues that will be most helpful to the Court to address. You really still care about the retaliation issue? Well, on retaliation, very briefly, Your Honor, we would like to rely basically on our brief. The retaliation issue goes away if you win the preemption, yes? Yes. What we want to say is if you agree with the district court and with the OCC on the regulation of operating subsidiaries, you can simply disregard them. Although the district court didn't reach the question of the license. The district court? Didn't rule on whether you can be licensed. Well, the view of the district court, which we think is correct, is that an operating subsidiary of a national bank doesn't need a license from the state to engage in. But I want to be so clear. I mean, this license issue seems to have emerged somewhat, and wasn't plain to me. I mean, one of the things is I don't understand why you were fighting about the license. I mean, if your position is you don't need a license, then why were you upset when they took it away from you? Well, very simply, Your Honor, we were trying to preserve the status quo until we could get a definitive ruling from the federal court. Wells Fargo and National City, for that matter, are very large. There are hundreds of thousands of customers. We just wanted to be sure we did the right thing. If we needed that state license, we wanted to be sure we had it. And I think ---- I think Judge Reinhart may be right that the district court, which focused on the visitorial powers, really didn't substantively rule that the licensing requirement was invalid. Did you challenge that specifically and separately? Yes. I mean, I think licensing is a part of visitorial powers. And let me back up one thing. It makes sense. I mean, you could require people to have the license and then say, but it's only enforceable by the comptroller. Well, it's been well established that for a national bank, for example, which operates pursuant to a federal charter and pursuant to a federal license, a state cannot say, well, you need a license. No, no. I think we understand that. Okay. I think if I recall the papers correctly, you did ask the court to rule that you could not be required to have a license. But I don't think that the district court actually did it. In the opinion, at least, it talks about visitation, and then it talks about the California statute. Right. Well, I think perhaps if you ---- But it never reaches the issue of licensing. I think, I mean, for example, if you looked in Judge Burrell's preliminary injunction opinion, that might help explain. His view of it was the state could go ahead and revoke the license because we didn't need it. We have a license from the Office of the Comptroller of the Currency to exercise national banking powers, that is, mortgage lending through an off-sub. And it's established when you've got a license from the federal agency, you don't need a second license from the state agency to exercise the federal powers that the federal agency has licensed you to exercise. You don't have a license. You have permission, but you don't have a license. I don't know if that matters. But given the way the statute is written, the regs are written, you don't literally have a license. Well, and I think it is a license from the OCC, which is more than permission. And that goes to another one of Your Honor's questions about sort of what is the kind of preemption we're dealing with here. And it is conflict preemption. The best single source to understand it is the Barnett Bank case, the unanimous decision of the Supreme Court. Which case? I didn't hear which case. Barnett Bank. Okay. The Barnett Bank case, which basically said. That's not true with regard to the visitorial rights. That's express preemption. Right? Well, it's conflict preemption. It's generally what applies when a national bank is exercising one of its powers, which can be an express or an implied power, an incidental power. And I think it's conceded in this case. I'm sorry. I'm losing you. Maybe I should stop. Go ahead. I mean, there was a little bit of back and forth at the beginning. But I think it is conceded, and not at issue in this case, that the OCC's determination in a legislative rule, 12 CFR 5.34, that one of the incidental powers of a national bank is to engage in any national banking activity through an op sub, through an operating subsidiary. That's conceded. That's not at issue in this case. So what the Barnett Bank case holds is that when there is a Federal banking power, express or incidental, the general presumption is that Congress would not want the States to prevent or significantly interfere with the exercise of that power. But what I was trying to say is this. The limitation on visitorial powers is in the statute. It's expressed. It's not conflict preemption as such. It's an expressed limitation. Yes, that's correct. Right? The rest is, you know, some level of inference. This is not any level of inference. There is a difference. Yes. That's correct. I mean, and the only thing I'd add, though, is that in this particular area of national bank preemption, because of the Barnett Bank case and other cases that are cited, there is this conflict preemption where it stands as an obstacle to the achievement of the Federal goals, which is, in many cases, a difficult argument. It's not particularly difficult for the national banks or for the OCC. And there's a long series of cases of the Supreme Court and other courts of appeals recognizing that if it is a prevention or significant interference with the exercise of the national bank power, then the state law is preempted. And, again, the power here is to exercise a lending power. That's a core Federal banking power. But you're not arguing that the states can't regulate the exercise of the lending power by either the national banks or subsidiaries. We are arguing that that is solely to be regulated by the office of the controller. That's not the position of the office of the controller. Oh, yes, it is. Excuse me. The position of the office of the controller, as I understood it was quite expressly, and I also understood it to be in his briefs, that absent the Monetary Control Act, for example, that state substantive statute would not be invalid, would not be cut. Oh, yes. This is complicated. It's all complicated. If you listen to the questions, you might have to go over them several times. Yes, Your Honor. I mean, not all state laws are substantively preempted. That's quite correct. But the OCC does take the position that they enforce all Federal laws and all nonpreempted state laws against both the national bank and the OPSUB. They treat the OPSUB just the same. I'm trying to clarify that there is not conflict preemption or field preemption in general with respect to mortgage regulation. Yes, that's correct. That's correct. So if we agreed with you, we would have to be agreeing that with regard to the operating subsidiaries, the Federal Government is going to be enforcing to some degree state laws? Yes, absolutely. Absolutely. By the state chartered institution. Yes. I mean, the practice has been, and this is not just the national banks, this is other kinds of thrifts, Federal S&Ls, Federal Reserve member banks, that there are these operating subsidiaries. That's something that banks are allowed to have. The practice has been they are chartered corporations and they do get a charter. What if the state just took the position that, well, fine, you know, but if we can't enforce our laws with regard to state chartered banking corporations, we're just not going to charter them? Well, if the state were to take that position, they might be able to do that. I mean, no state has tried to do that. All the OCC is saying is, look, you know, we will regulate the federally authorized banking activities when a national bank chooses to exercise those activities through this op sub, which is a state chartered corporation. All we're talking about today is whether the state banking regulator can say, no, we're going to regulate those banking activities. Presumably for other purposes, like for limited liability purposes, these subsidiaries get whatever benefit there is of having a separate corporation. So if, for example, somebody tried to sue Wells Fargo because of something this operating subsidiary did, you couldn't do that? It would be an ordinary, you know, piercing the corporate bail problem. I think that would be one of those issues that state law would control. And, again, that's not an issue that's before this court, but I would say that the OCC treats the op sub as a department or division of the bank. There's no difference, is there, in your view, between what the state may do with respect to the operating subsidiary or to the national bank itself? That's correct. State laws may affect and regulate both to whatever extent they're not preempted, and there may be no visitation with respect to either. That is what the OCC's regulations hold. So to ---- Well, it doesn't matter that these are state-charted or anything else. They're subject to regulation, in your view, just the way banks are, no more, no less. Yes, Your Honor. That's our position. And Judge Berzon asked a question way back at the beginning, saying, you know, that's all right, and it's okay for the OCC to regulate those, just as they would regulate the national bank itself. But we, the state, want to come in and also regulate, perhaps have different regulations, perhaps disagree with the OCC. And that's not consistent with the regulation, first of all, which says ---- Yes, it is, except they can't enforce it. Exactly. Yes. We're back to that. Yes. And I've finally gotten it, Your Honor, and I agree. I think maybe I should move off that, unless there are other questions, except to say briefly, there is some statutory ---- It's the state law that we're talking about, which regulates when you can collect interest or when you can impose interest. Yes. That would be, would that be equally applicable to the bank as to the operating subsidiary? Well, like a number of the questions, that's a bit complicated. As I understand it, the state law says, this is just a choice California has made, that it would not apply to national banks, although there is one provision of the state law that doesn't have an express exception for national banks. So perhaps for that one, the state would say, yes, this per diem interest requirement applies to all. Now, going back to our back and forth, the OCC will enforce all nonpreempted state laws against both national banks and their operating subsidiaries. Now, we get to this question of whether this per diem interest law is preempted by this federal law. We call it DIDMCA. That's the acronym for Depository Institutions, et cetera. And so that is a separate question. And if we're wrong about that, if it's not preempted, then it does apply, certainly applies to the operating subsidiary expressly. That's what state law says. And the OCC would then enforce that against the bank. Now, we don't ---- And your position is that although this does not regulate a rate, and it does not regulate an amount as such, but rather it describes the time expressly, what it expressly does is describe the time when you can start charging interest. Nonetheless, it falls within the statute. Well, we do think it is a regulation of the rate or amount of interest. But the statute is an unusual one because it says expressly, right? Yes. What does this expressly do? Well, I mean, it does say what the state law says is you can only, before it was amended, the version that we're talking about here says you can only charge interest for one day before the mortgage or deed of trust is recorded. So it's an express limitation of interest, both the rate and the amount, to zero until you get ---- It doesn't say, for example, that you couldn't put in the mortgage document that, you know, that the rate of interest, if it starts on such and such a day, is X, but if it starts on a day later, it's Y for the whole long. Right. Does it say anything in the statute? Well, as I understand it, and I apologize, again, this is very complicated. On page 48 of our opening brief, my understanding is that under the ---- and this was mentioned briefly. Under the Truth in Lending Act and under Regulation Z, you must ---- there's a sort of order in which this has to happen. The money has to come into escrow. You have to set the rate of interest, which then can't be changed. It's got to be fixed. And my understanding is, although I'm not sure I've ever heard of your particular solution, that you could say, well, we'll come back depending on how long it takes to record. Well, it wouldn't be come back. It would all be set out. And it would say, you know, if it starts on X day, it's X, and if it starts on Y day, it's ---- Well, my understanding is that would be illegal under Regulation Z, that you must have, and this is 12 CFR Part 226, that you really must set a specific rate of interest. And in a way it ---- It can't have a contingent rate. Right. I mean, that's ---- and I think in a way it goes right to the heart of this issue. I mean, in a way, it's sort of picayune, because usually you're going to be talking about ---- I mean, most of the time, these things do get recorded promptly, as I understand it. Most of the time, if they don't, you're talking about a couple of days or a week. What is your position about the new statute? Well, our position on the new statute is that it indicates that the California legislature recognized that this date of recording ---- Well, I understand that, but it's still the same. I mean, why isn't it the same thing? It still sets out ---- it still says you can't charge an interest rate as of the date of recording. Oh, I see. I see. Whether the new statute is preempted. Well, it's not in this case because the policy of both Wells Fargo and National City is not ---- So it helps to understand what your line of demarcation is. Yes, I know. Although I would like to put on the record that both banks don't charge interest until the borrower actually gets the use of the money. I mean, I think, frankly, it's a harder question on whether it is preempted because you could get into an issue about, well, if the borrower doesn't even have use of the money, is that even interest if it's sitting in escrow someplace? I mean, I think ultimately if pushed, I would say it is in escrow. The bank doesn't have the use of the money, neither does the borrower. It's sort of in limbo. It's in the middle ground. So if pressed, I would argue, yes, that if there are unforeseeable delays, that would also be preempted. But I acknowledge that's a harder question. It's not in this case. The recording is not something that helps the borrower. It just helps the lender to record. And that's, I think, why California amended the law. All right. Counsel, you're kind of expired. Several points on rebuttal, Your Honors. Number one was the issue of whether or not the comptroller can enforce nonpreempted State laws. First of all, they contend that they have that authority, but still the comptroller would exercise the discretion as to whether or not to exercise that authority. California, or any other State, stands in a better position to interpret and apply its laws, especially as to California's consumers. But you can't do this to banks. The comptroller would have to enforce your laws with respect to banks. That would be correct. And we, in no instance here... And so what's so much worse about doing it with respect to the wholly-owned subsidiaries of banks? With regard to the comptroller, Your Honor? Yeah. Again, it goes back to the fact that they're operating in our jurisdiction. They're not a national bank. They voluntarily, in this case, sought licensure. No, I understand how you distinguish it. While you say, in one case, legally you're not required to have them enforce it, and in the other case you are, I understand you have a reason for distinguishing. But when you point out the consequences of losing your, you know, ability to determine your own fate in effect, I say you'd only put the subsidiaries in the same circumstance that the banks themselves are now in. Well, in this instance, though, Your Honor, the national bank at that time was not conducting the lending activity. It was being conducted through the operating subsidiary. That's true. But I guess the real question is that it's a little hard to understand, you know, what the stakes here are, because there seems to be something of a fortuity as to whether or controlled by other factors, not a fortuity. There are reasons, I presume, why they operate through subsidiaries sometimes and not others. But Wells Fargo, for example, now seems to have taken the whole mortgage operation in-house. And from a consumer's point of view, what difference does that make? In other words, you're standing up here as the champion of the consumer. But you're also acknowledging that, as I understand it, although I'm not really sure why, that you couldn't do this if it were the bank, but you can do it if it's the subsidiary. Let me clarify why I couldn't do it as to the national bank. And that would be that specifically to the statute that says you can't. It exempts national banks from our statutory scheme. But with regard to the operating subsidiaries who are licensed by us, then we have an entire statutory scheme that we seek to enforce, that the California legislature has enacted and has determined. But from a consumer point of view, it really doesn't make a difference. I would say that it would make a difference to the consumer, because there may be a different set of laws applicable to the operating subsidiary operating in these state borders than those applicable to the national bank. But that isn't what the controller's regulations say. They say that everything that applies to the national bank applies to the operating subsidiaries. That's what the controller says. But my point is that the controller has discretion as to whether or not to enforce those state laws. It is not mandated that, in fact, the controller would do that. Secondly, and it goes back to Judge Berzon's point, is Mr. Sneed related that banks can't engage in this activity without the state license, or that that is California's contention that the banks wouldn't be able to do this. But as pointed out by Judge Berzon, in fact, Wells Fargo has absorbed this lending activity into the national bank, which it would be free to do while a license application was pending. Judge Berzon also brought up the new lawsuits, and Mr. Sneed responded that the new regulation sharpened, and in the briefs it's been referred to as clarified, and in specific we're talking about 7.4006. I would contend that prior to the promulgation of that regulation, which was August 1st of 2001, it was not necessarily understood that states were not entitled to license and or exercise visitorial power over these operating subsidiaries, which is why we're seeing this issue visited in two other district courts and now up in appeal in the Second and Sixth Circuits as well. As to the retaliation issue, Judge Burrell, I think, addressed it best when he said that Wells Fargo's position wasn't just a position. They wanted to maintain the status quo, but yet they stated that they would not comply with the statutory scheme under which they were licensed. Therefore, I contend that the 1983 action is without support. And without any further questions, I submit that the comptroller has exceeded his authority and this Court should reverse the district court. Thank you, counsel. Thank you. Thank you all very much. Very helpful. The case is argued and will be submitted. The Court will stand in recess for the day. Thank you. Thank you. Thank you.
judges: Reinhardt, Paez, Berzon